# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

EHSAN MOHAMMAD NOURZAY,           ) Case No. CV 17-2385-JPR
                                  )
                    Plaintiff,    )
                                  ) **MEMORANDUM DECISION AND ORDER**
          v.                      ) **AFFIRMING COMMISSIONER**
                                  )
NANCY A. BERRYHILL, Acting        )
Commissioner of Social            )
Security,                         )
                                  )
                    Defendant.    )
_____     )

## I.    PROCEEDINGS

Plaintiff seeks review of the Commissioner's final decision denying his application for Social Security disability insurance benefits ("DIB").  The parties consented to the jurisdiction of the undersigned under 28 U.S.C. § 636(c).  The matter is before the Court on the parties' Joint Stipulation, filed December 15, 2017, which the Court has taken under submission without oral argument.  For the reasons stated below, the Commissioner's decision is affirmed.

1

## II. BACKGROUND

Plaintiff was born in 1953. (Administrative Record ("AR") 72.) He completed two years of college (AR 37) and worked as a childcare provider and mechanic (AR 40, 177).

On July 23, 2013, Plaintiff applied for DIB, alleging that he had been disabled since July 1 because of a stroke, diabetes, high blood pressure, high cholesterol, depression, "heart problems," stress, and joint pain. (AR 72, 158.) After his application was denied (AR 116-21), he requested a hearing before an Administrative Law Judge (AR 122). A hearing was held on August 12, 2015, at which Plaintiff, who was represented by counsel, testified, as did a vocational expert. (AR 32-71, 131.) In a written decision issued October 13, 2015, the ALJ found Plaintiff not disabled. (AR 19-31.) Plaintiff requested review from the Appeals Council (AR 14-15), and on February 8, 2017, it was denied (AR 1-5). This action followed.

## III. STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits. The ALJ's findings and decision should be upheld if they are free of legal error and supported by substantial evidence based on the record as a whole. See id.; Richardson v. Perales, 402 U.S. 389, 401 (1971); Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007). Substantial evidence means such evidence as a reasonable person might accept as adequate to support a conclusion. Richardson, 402 U.S. at 401; Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007). It is more than a scintilla but less than a preponderance. Lingenfelter, 504 F.3d at 1035 (citing Robbins v. Soc. Sec.

Admin., 466 F.3d 880, 882 (9th Cir. 2006)). To determine whether substantial evidence supports a finding, the reviewing court "must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998). "If the evidence can reasonably support either affirming or reversing," the reviewing court "may not substitute its judgment" for the Commissioner's. Id. at 720-21.

## IV. THE EVALUATION OF DISABILITY

People are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or has lasted, or is expected to last, for a continuous period of at least 12 months. 42 U.S.C. § 423(d)(1)(A); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992).

### A. The Five-Step Evaluation Process

The ALJ follows a five-step sequential evaluation process to assess whether a claimant is disabled. 20 C.F.R. § 404.1520(a)(4); Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995) (as amended Apr. 9, 1996). In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim must be denied. § 404.1520(a)(4)(i).

If the claimant is not engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting his ability to do basic work

3

activities; if not, the claimant is not disabled and his claim must be denied. § 404.1520(a)(4)(ii).

If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments set forth at 20 C.F.R. part 404, subpart P, appendix 1; if so, disability is conclusively presumed. § 404.1520(a)(4)(iii).

If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient residual functional capacity ("RFC")[1] to perform his past work; if so, he is not disabled and the claim must be denied. § 404.1520(a)(4)(iv). The claimant has the burden of proving he is unable to perform past relevant work. Drouin, 966 F.2d at 1257. If the claimant meets that burden, a prima facie case of disability is established. Id.

If that happens or if the claimant has no past relevant work, the Commissioner then bears the burden of establishing that the claimant is not disabled because he can perform other substantial gainful work available in the national economy. § 404.1520(a)(4)(v); Drouin, 966 F.2d at 1257. That determination comprises the fifth and final step in the

---

[1] RFC is what a claimant can do despite existing exertional and nonexertional limitations. § 404.1545; see Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989). The Commissioner assesses the claimant's RFC between steps three and four. Laborin v. Berryhill, 867 F.3d 1151, 1153 (9th Cir. 2017) (citing § 416.920(a)(4)).

4

sequential analysis. § 404.1520(a)(4)(v); <u>Lester</u>, 81 F.3d at 828 n.5; <u>Drouin</u>, 966 F.2d at 1257.

### B. The ALJ's Application of the Five-Step Process

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since July 1, 2013, the alleged onset date. (AR 21.) At step two, he concluded that Plaintiff had no severe mental impairments but had medically determinable physical ones: "orthopedic issues in the back and left leg, arm and wrist." (<u>Id.</u>) At step three, he found that Plaintiff did not meet or equal a listing. (AR 23.) At step four, he found that Plaintiff had the RFC to perform medium work but was "limited to frequent climbing, balancing, stooping, kneeling, crouching and crawling." (<u>Id.</u>) Based on the VE's testimony, the ALJ concluded that Plaintiff could perform his past relevant work as an "auto mechanic," DOT 620.261-010, 1991 WL 685242, and "child monitor," DOT 301.677-010, 1991 WL 672652, as actually and generally performed. (AR 28.) Thus, the ALJ found Plaintiff not disabled. (<u>Id.</u>)

## V. DISCUSSION

Plaintiff argues that because the ALJ allegedly erred in evaluating the medical-opinion evidence, he erred in finding no severe mental impairment (<u>see</u> J. Stip. at 3-5, 9-12) and in determining his RFC (<u>see</u> <u>id.</u> at 12-17, 22-23). The ALJ also erred, Plaintiff continues, in rejecting his subjective symptom testimony and the statement of his daughter. (<u>Id.</u> at 23-28, 34-35.) Plaintiff contends that because of these alleged errors, the ALJ improperly concluded that he could perform his past relevant work. (<u>See</u> <u>id.</u> at 35-36.) But for the most part the

5

ALJ did not err, and none of his errors warrant remand.[2]

A.    The ALJ Properly Evaluated Plaintiff's Subjective
      Symptom Testimony

The ALJ found that Plaintiff's medically determinable impairments "could reasonably be expected to cause [his] alleged symptoms" but that his statements concerning the "intensity, persistence and limiting effects of these symptoms" were "not entirely credible." (AR 26.) Plaintiff argues that the ALJ "fail[ed] to provide specific, clear and convincing reasons supported by substantial evidence in the record" to support that finding. (J. Stip. at 23.) But as discussed below, the ALJ provided several.

1.    Applicable law

An ALJ's assessment of a claimant's allegations concerning the severity of his symptoms is entitled to "great weight." See Weetman v. Sullivan, 877 F.2d 20, 22 (9th Cir. 1989) (as amended); Nyman v. Heckler, 779 F.2d 528, 531 (9th Cir. 1985) (as amended Feb. 24, 1986). "[T]he ALJ is not 'required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A).'" Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012) (quoting Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989)).

In evaluating a claimant's subjective symptom testimony, the ALJ engages in a two-step analysis. See Lingenfelter, 504 F.3d

---

[2] For efficiency, the Court addresses Plaintiff's arguments in an order different from that used by the parties.

at 1035-36; <u>see also</u> SSR 96-7p, 1996 WL 374186 (July 2, 1996).[3]
"First, the ALJ must determine whether the claimant has presented
objective medical evidence of an underlying impairment [that]
could reasonably be expected to produce the pain or other
symptoms alleged." <u>Lingenfelter</u>, 504 F.3d at 1036. If such
objective medical evidence exists, the ALJ may not reject a
claimant's testimony "simply because there is no showing that the
impairment can reasonably produce the <u>degree</u> of symptom alleged."
<u>Smolen v. Chater</u>, 80 F.3d 1273, 1282 (9th Cir. 1996) (emphasis in
original).

 If the claimant meets the first test, the ALJ may discredit
the claimant's subjective symptom testimony only if he makes
specific findings that support the conclusion. <u>See</u> <u>Berry v.</u>
<u>Astrue</u>, 622 F.3d 1228, 1234 (9th Cir. 2010). Absent a finding or
affirmative evidence of malingering, the ALJ must provide "clear
and convincing" reasons for rejecting the claimant's testimony.
<u>Brown-Hunter v. Colvin</u>, 806 F.3d 487, 493 (9th Cir. 2015) (as

---

[3] Social Security Ruling 16-3p, 2016 WL 1119029, effective
March 16, 2016, rescinded SSR 96-7p, which provided the framework
for assessing the credibility of a claimant's statements. SSR
16-3p was not in effect at the time of the ALJ's decision in this
case, however, and therefore does not apply. Still, the Ninth
Circuit has clarified that SSR 16-3p

  makes clear what our precedent already required: that
  assessments of an individual's testimony by an ALJ are
  designed to "evaluate the intensity and persistence of
  symptoms after [the ALJ] find[s] that the individual has
  a medically determinable impairment(s) that could
  reasonably be expected to produce those symptoms," and
  not to delve into wide-ranging scrutiny of the claimant's
  character and apparent truthfulness.

<u>Trevizo v. Berryhill</u>, 871 F.3d 664, 678 n.5 (9th Cir. 2017) (as
amended) (alterations in original) (quoting SSR 16-3p).

amended); <u>Treichler v. Comm'r of Soc. Sec. Admin.</u>, 775 F.3d 1090, 1102 (9th Cir. 2014). The ALJ may consider, among other factors, (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; (3) the claimant's daily activities; (4) the claimant's work record; and (5) testimony from physicians and third parties. <u>Rounds v. Comm'r Soc. Sec. Admin.</u>, 807 F.3d 996, 1006 (9th Cir. 2015) (as amended); <u>Thomas v. Barnhart</u>, 278 F.3d 947, 958-59 (9th Cir. 2002). If the ALJ's assessment of the claimant's subjective symptom statements is supported by substantial evidence in the record, the reviewing court "may not engage in second-guessing." <u>Thomas</u>, 278 F.3d at 959.

## 2. Relevant background

### a. *Mental-Health Records*

In October 2013, Plaintiff was seen by consulting psychologist Lou Ellen Sherrill[4] for evaluation. (AR 273-77.) There were "no mental health records available" for her to review, and no "licensed clinical psychologist" or "board certified psychiatrist" had "diagnos[ed] him with a major mental disorder." (AR 274.) He also was not receiving mental-health services at the time, nor was he taking psychotropic medication.

---

[4] Dr. Sherrill's last name appears on her report typed as "Hisrill." (<u>See</u> AR 277.) But her signature suggests that her name is indeed "Sherrill" (<u>see</u> <u>id.</u>), and the parties and ALJ call her "Sherrill" as well (<u>see</u> AR 27; J. Stip. at 5, 7).

(Id.)

Plaintiff complained of depression and anxiety and described himself as "lazy." (AR 273-74.) He reported having "memory problems," "panic attacks," and sometimes "difficulty sleeping." (AR 274.) He also experienced "negative" side effects from his high-blood-pressure medications, specifically "dizziness" and disrupted "concentration and focus." (Id.) Plaintiff reported having "good" relationships with his family and "all types of contacts and people." (Id.) He could perform "all self-care activities independently, including dressing and bathing," but his family "help[ed] him" with other things. (AR 275.) They "manage[d] his money," and he "relie[d]" on them for transportation. (Id.)

On examination, Plaintiff was "oriented in all dimensions," "spoke clearly," and "underst[ood] test instructions and interview questions without difficulty." (AR 275-76.) His mood and affect were "normal," and he had "no problems" making eye contact or reading nonverbal behavior. (AR 276.) He was able to engage in a "friendly conversation," and there was "no evidence of a thought disturbance with respect to any apparent psychotic processes." (Id.) He displayed "poor commonsense judgment": when asked what he would do if his "house was on fire," he said he would "go outside and watch." (Id.) He presented with a "relatively fair fund of information," providing the names of the current and past presidents of the United States but not knowing the name of the governor of California. (Id.) He scored within the "borderline range" on an intelligence and a memory test. (Id.)

Dr. Sherrill diagnosed Plaintiff with dysthymia, secondary to medical problems, and borderline intellectual functioning, "[p]hase of [l]ife [p]roblem." (AR 277.) His condition, Dr. Sherrill opined, was "not severe enough to be considered disabling." (AR 276.) He had "adequate intelligence, memory, and emotional stability" to participate in the workforce. (AR 276-77.) Functionally, he could perform "simple and repetitive tasks with minimal supervision" and was able to do so "with appropriate persistence and pace over a normal work cycle." (AR 277.) He could understand, remember, and carry out "at least simple to moderately complex" verbal instructions "without difficulty" but would have "mild difficulty" tolerating ordinary work pressures and "mild to moderate difficulty" interacting satisfactorily with others, including the general public. (Id.) He could observe basic work and safety standards in the workplace "without difficulty" and handle his own financial affairs "independently, unless proven otherwise." (Id.)

Later in October 2013, Plaintiff's medical records were reviewed by state-agency examiner R. Asatourian. (See AR 72-83.) He found that Plaintiff had the severe impairment of "Affective Disorders," along with certain physical conditions (AR 76), and assessed him with a mental RFC for understanding, remembering, and carrying out "simple work-related tasks" (AR 80-81). Plaintiff had "no significant work-related limitations" as to adaptation, social interactions, and concentration, persistence, or pace. (Id.) But he did have some moderate limitations in understanding and remembering "detailed instructions" (AR 79); carrying out "detailed instructions" (AR 80); performing

10

activities within a schedule, maintaining regular attendance, and being punctual within customary tolerances (id.); and completing a normal workday and workweek without interruptions from psychologically based symptoms (id.).

Plaintiff's medical records were reviewed again, in February 2014, by state-agency psychiatrist R. Singh. (See AR 112, 114.) Dr. Singh found Plaintiff to have the same severe mental impairment of "Affective Disorders" and the same functional limitations. (See AR 107, 111-12.)

### b. *Physical-Health Records*

In June 2013, shortly before his alleged onset date, Plaintiff was admitted to a hospital emergency room complaining of weakness and numbness in his left arm and leg. (AR 239.) He had had a "small stroke" (see AR 357) and on examination displayed mild — but "inconsisten[t]" — symptoms (see AR 250). A consulting neurologist noted that by the time he saw Plaintiff, his symptoms had "essentially resolved" and he was at "his normal baseline." (AR 249; see also AR 242 ("His motor deficits quickly and significantly improved.").) Plaintiff had "some subtle decreased" sensation to "pinprick" "light touch" in his left face, "some weakness in [his] left grip," "questionable mild weakness versus give-away"[5] in his "entire left upper extremity," and "some patchy decreased" sensation to "pinprick" "light touch"

---

[5] Give-away weakness, also referred to as "give-way" or "collapsing" weakness, occurs when a patient is not trying, such as when his or her limb collapses from a normal position with only light touch or even before being touched. See J. Stone et al., Functional Weakness and Sensory Disturbance, 73 J. Neurology Neurosurgery Psychol. 241, 242 (2002), http://jnnp.bmj.com/content/73/3/241.

in his left extremities but "normal" bulk and tone, "no pronator drift," and "nearly essentially normal" strength in his left lower extremity. (AR 250.) MRI scans of his brain showed signs of "chronic small vessel ischemia" but were otherwise "normal." (AR 252-54; see also AR 255 (CT scan of brain revealing "normal" findings).) And examinations of his heart and chest were similarly "normal" or "mild." (See AR 256 ("Normal frontal chest x-ray."), 257-59 (echocardiogram revealing "mild regurgitation" in his mitral valve but "normal" systolic function, with ejection fraction of "55% to 65%"),[6] 260 (carotid duplex report showing "[n]o evidence of hemodynamically significant stenosis or significant plaque formation in either the left or right carotid systems").) He was discharged in "stable condition" with prescriptions for various medications, including gabapentin.[7] (AR 242.)

Plaintiff returned to the emergency room in August 2013, complaining of a fever and "muscle aches." (AR 233.) He appeared "normal" on examination and displayed "normal [range of motion]" in his extremities and "[n]o motor deficit[s]." (AR 234.) He was treated "with fluids" and his symptoms "resolved." (AR 236.) He was discharged with instructions to "[d]rink plenty

---

[6] Ejection fractions measure how much blood is pumped from the left ventricle of the heart. See Ejection Fraction, Cleveland Clinic, https://my.clevelandclinic.org/health/diseases/ 17069-heart-failure-understanding-heart-failure/ejection-fraction (last updated Oct. 2016). An ejection fraction of "55% to 70%" indicates normal pumping ability and heart function. Id.

[7] Gabapentin is an anticonvulsant sometimes used to relieve pain. See Gabapentin, MedlinePlus, https://medlineplus.gov/ druginfo/meds/a694007.html (last updated Nov. 15, 2017).

of fluids" and "not smoke."  (Id.)

In October 2013, Plaintiff was again admitted to the emergency room, this time complaining of "chest discomfort."  (AR 388.)  He had apparently been "using a treadmill" when he became "dizzy" and felt "tightness" and "8/10" "pain" in his "central chest area."  (Id.)  On examination, his chest was "nontender," his cardiac rhythm was "normal," and his breath sounds, heart sounds, and pulse were all "within normal limits."  (AR 393.)  He also displayed "normal [range of motion]" in his extremities and no motor or sensory deficits.  (AR 390.)  A stress test was administered and revealed an ejection fraction of 63 percent and no "wall motion abnormalities," though there was "suspicious subtle reversible malperfusion of the anterior myocardium."  (AR 399.)  An echocardiogram further revealed "[l]eft ventricular diastolic dysfunction" and "mild annular calcification" in his mitral valve, but "normal" systolic function, an ejection fraction of 55 percent, and "no regional wall motion abnormalities."  (AR 401-02.)  A catheterization[8] was then performed, which revealed "normal coronaries"; thus, "no angioplasty or stents were placed."  (AR 387.)  He was discharged "to follow up with his primary doctor and to continue with all his home medications," and "[n]o new medications were given."  (Id.)

---

[8] Cardiac catheterization is an imaging procedure used to evaluate heart function and is not considered surgery because no large incision is used to open the chest.  See Cardiac Catheterization, Cleveland Clinic, https:// my.clevelandclinic.org/health/diagnostics/16832-cardiac-catheterization (last updated Sept. 2013).

In January 2014, Plaintiff saw consulting examiner Jay
Dhiman for a "complete internal medicine evaluation." (AR 305-
10.) Plaintiff reported problems with diabetes, chest pain,
"left-sided weakness," and low-back and leg pain, which worsened
with standing for more than "10-20 minutes" and improved with
"pain medication[] and rest[]." (AR 305-06.) He reported taking
gabapentin, among other pain and diabetes medications. (AR 306.)
On examination, Plaintiff was alert and oriented "x4," had
"normal" gait and station, and got on and off the examination
table "without any difficulty." (AR 307. <u>But see</u> AR 309
(Plaintiff had "slight difficulty" walking "in tandem," was
unable to walk on heels or toes, and could squat only 25
percent).) His neck's range of motion was "within normal
limits." (AR 307.) His chest had "no tenderness." (<u>Id.</u>) His
back displayed some tenderness in the "mid and lower" lumbar
spine, with "decreased range of motion" but "negative" straight-
leg raises. (AR 308-09.) His shoulders, elbows, wrists, hips,
knees, and ankles had "grossly normal" range of motion. (<u>Id.</u>)
And he was normal neurologically and had "5/5" strength in "all
extremities." (AR 309.)

Based on the exam and Plaintiff's recent lumbar-spine x-ray
(<u>see</u> AR 311 (Jan. 2014 x-ray of lumbar spine revealing "[e]arly
osteophytosis" and "[b]ony bridging T11-12 anteriorly" but
remaining tissues and structures "within normal limits")), Dr.
Dhiman opined that he could "stand and walk" for six hours in an
eight-hour workday, sit without limitation, and "lift or carry"
50 pounds "occasionally" and 25 pounds "frequently." (AR 309.)
He could feel, finger, grasp, and overhead reach "frequently."

(AR 309-10.)  And he could bend, stoop, and crouch "frequently."
(AR 310.)  He also had "no visual, communicative, or
environmental limitations."  (Id.)

In February 2014, Plaintiff fell while using a stepladder,
fracturing his left wrist and tailbone.  (AR 381, 423; see
also AR 452 (x-ray of left wrist), 453 (x-ray of coccyx).)  His
wrist was put in a cast (AR 381), and he began seeing orthopedic
surgeon Beno Nersissian to treat both injuries (AR 423, 455).
Dr. Nersissian prescribed acetaminophen-oxycodone[9] for the pain
(AR 423) and regularly inspected Plaintiff's left wrist and
tailbone to oversee their healing and alignment (see, e.g., AR
423-25 (Feb. 26, 2014), 421-22 (Feb. 28, 2014), 420 (Mar. 7,
2014), 417-18 (Mar. 14, 2014), 415-16 (Mar. 21, 2014), 413-14
(Apr. 4, 2014), 411-12 (Apr. 29, 2014)).  Though Plaintiff
continued to complain of pain, Dr. Nersissian consistently noted
that his fractures were "healing" with "excellent" alignment.
(See, e.g., AR 411, 413, 415, 417.)

Beginning in May 2014, Plaintiff began reporting "severe
pain and discomfort in [his] neck."  (AR 409.)  At the time, his
cervical spine exhibited tenderness and "painful range of
motion."  (Id.)  No further treatment notes of his neck pain by
Dr. Nersissian appear in the record, however.  In October 2014,
he also began to complain of lower back pain that radiated down
his right leg.  (AR 406.)  His lumbar spine demonstrated

_____

[9] Oxycodone is a narcotic analgesic used to relieve moderate
to severe pain and can be combined with acetaminophen.  See
Oxycodone, MedlinePlus, https://medlineplus.gov/druginfo/meds/
a682132.html (last updated Mar. 15, 2018).

tenderness and "painful range of motion." (Id.) Dr. Nersissian diagnosed him with "degenerative thoracolumbar disc disease," "[r]ight-sided lower extremity radiculitis," and "carpal [t]unnel syndrome" (apparently based on x-rays at the time) and prescribed Ultram.[10] (Id.) Although Plaintiff continued to complain of lower-back pain in November 2014, his lumbar spine exhibited no tenderness or muscle spasm. (AR 405.)

Plaintiff's complaints of chest pain reappeared in September 2014, when he was admitted to a hospital emergency room. (See AR 345.) He reported not only chest pain but pain in his neck and teeth, numbness in his left arm, shortness of breath, and lower than usual energy levels. (Id.) On examination, he had "full range of motion" in his neck, with some "pain with pressure over [his] lower neck"; "full," "painless" range of motion in his back, with negative straight-leg raises and no tenderness or muscle spasm; "no motor [or] sensory deficits"; and "normal gait." (AR 347.) His heart, however, exhibited a "gallop" and "murmur." (AR 355). An echocardiogram and stress test were ordered (AR 356), but they revealed "[n]o . . . abnormalities" and "no evidence of chamber enlargement, wall motion abnormalities, cardiomyopathy, aortic stenosis, mitral valve prolapse, [or] bicuspid aortic valve or pericardial effusion" (AR 376). He also had "55% to 65%" ejection fraction, "normal" left ventricular diastolic function, and "normal" systolic function.

---

[10] Ultram is the brand-name version of tramadol, a narcotic analgesic used to relieve moderate to moderately severe pain. See Tramadol, MedlinePlus, https://medlineplus.gov/druginfo/meds/a695011.html (last updated May 21, 2018).

(AR 377, 379.)

A neurologist examined Plaintiff as well: his neck had "full range of motion," his bulk and tone were "normal," and he demonstrated "no pronator drift" but "subtle-mild[]" weakness in his left upper extremity, "some" "diffuse" weakness in his left hand, "some decreased pinprick to light touch" sensation in his left hand, and "very minimal" weakness in his left lower extremity. (AR 358.) He reported walking on a treadmill "30 to 45 minutes most days." (Id.) An MRI of his brain was ordered and was "unremarkable"; "[n]o acute abnormalities" were demonstrated. (AR 368.) An MRI of his cervical spine was also ordered and showed "minimal degenerative changes," "minimal foraminal narrowing" at C5-6 and C4-5, and "no significant spinal stenosis." (AR 369-70; see also AR 371 (cervical-spine CT showing "moderate disc space narrowing at C5-6 with mild disc space narrowing at C3-4 and C4-5" and "normal" alignment).) The neurologist reviewed Plaintiff's medical imaging and diagnosed him with unstable angina, left-arm pain, and vertigo. (AR 367.) He found "no evidence of new stroke, intracranial or carotid stenosis, or any significant cervical [degenerative disc disease]." (Id.) Wrist braces were "recommended" (id.), and Plaintiff was discharged home (AR 344).

Plaintiff returned to the emergency room in November 2014, complaining of dizziness and "intermittent" chest pain. (See AR 315, 320, 328.) An MRI of his brain revealed "[m]ild atrophy" and "[m]inimal small vessel ischemic change" but "[n]o acute intracranial abnormality" or "appreciable interval change." (AR 339.) An echocardiogram revealed "normal" diastolic and systolic

17

function, with a 55 to 65 percent ejection fraction, "no
significant stenosis," and only "mild regurgitation" in his
mitral and tricuspid valves.  (AR 317-18.)  On examination, he
had "regular" cardiovascular and respiratory findings (AR 324,
330) and "normal" extremities, back, and neurologic function (AR
331 (extremities demonstrating no tenderness, "full range of
motion," and "intact" motor function; back demonstrating no
tenderness and "painless range of motion"; and Plaintiff
otherwise demonstrating "no motor deficits" or "sensory
deficits")).

In July 2015, Dr. Nersissian completed a medical-source
statement.  (AR 454-55.)  He noted that he last saw Plaintiff
eight months earlier, in November 2014 (AR 455), and nowhere in
his statement did he indicate how far back or how recently his
assessments applied.  He opined that Plaintiff could lift or
carry only up to 10 pounds both occasionally and frequently.  (AR
454.)  He provided no "supporting medical findings" for that
assessment, but he determined that Plaintiff could "stand and/or
walk" less than two hours in an eight-hour workday given his
"carpal tunnel syndrome," "degenerative lumbar disc disease," and
"sciatica."  (Id.)  He could also sit less than six hours in an
eight-hour workday given his "sciatica."  (Id.)  And he needed to
alternate between standing and sitting because of his "sciatica"
and "degenerative lumbar disc disease" — though breaks and lunch
period would "provide [him] sufficient relief."  (Id.)  He could
occasionally climb, balance, and kneel but never stoop, crouch,
or crawl given his "degenerative lumbar disc disease," "low back
pain," and "sciatica."  (AR 455.)  And because of his "carpal

tunnel syndrome," he could constantly reach and occasionally handle but never finger or feel with his fingertips. (Id.) Dr. Nersissian further opined that Plaintiff would have "environmental restrictions" for heights and temperature extremes but provided no "supporting medical findings." (Id.) Plaintiff's prognosis, in his opinion, was "poor." (Id.)

c. <em>Plaintiff's and Third-Party Statements</em>

In August 2013, Ramzia Nourzay, Plaintiff's daughter (AR 194), completed two function reports: her father's on his behalf (AR 185-93) and her own as a third party (AR 194-200). Plaintiff's report indicated that he was unable to work because he had diabetes, which made it "hard" to "maintain a steady schedule"; back pain, which "prevent[ed]" him from "lift[ing] more than a few pounds"; mood swings "due to [diabetes] and [his] other illnesses such as high blood pressure, cholesterol, and joint pain"; "depression problems"; and "forgetful[ness]." (AR 185.) He also could not "sleep at night, even with medications" (AR 186), needed reminders to take medicine and take care of "personal needs and grooming" (AR 187), was not "comfortable going [out] alone" (AR 188), was unable to handle money or manage his finances (AR 188-89), couldn't "sit for too long" (AR 189), and had "problems getting along with family, friends, neighbors, or others" because he "tend[ed] to argue a lot." (AR 190). He could pay attention for only "[a] few minutes" and follow written instructions "as long as it[] [was] in Farsi" but didn't follow spoken instructions "too well" because he "tend[ed] to forget things." (Id.) He also indicated that his medications caused various side effects, including back and leg pain, dizziness,

19

weakness, and "anxious feelings." (AR 192.)

He had no problems with personal care (AR 186), prepared microwaveable meals "3 times a day" (AR 187), "cut roses" and "put dishes away" (id.), went outside "2 or 3 times a week" by riding in a car or using public transportation (AR 188), and spent time with others "[d]aily" by speaking to his children and other family "over the phone" (AR 189). He got along "okay" with authority figures, handled stress "[g]ood," and handled changes in routine "okay." (AR 191.)

His daughter's report indicated that he "[did] not have good health," "[was] always sick," "[had] difficulty completing a task," "[was] very forgetful," and "[had] a bi-polar personality." (AR 194.) His standing, walking, bending, and reaching were "very minimal," and he was "very angry all the time." (AR 199.) He took care of his wife and son but "[didn't] do very much for them." (AR 195.) He "barely sle[pt]" and didn't "care" or "have [the] energy" to take care of some personal-hygiene things like dressing and bathing (id.); he always needed reminders (AR 196). He prepared microwaveable meals "[d]aily" but couldn't "stand for too long due to back pain." (Id.) He could walk for 10 minutes before having to rest and needed to rest for 30 minutes before "resum[ing] walking." (AR 199.) He did not get along with others because he would "get[] in arguments" and "[was] a very negative person." (Id.) The daughter stated that she fired him from his last job "due to [his] being disrespectful with others." (AR 200.)

He also spent "10-15 min[utes] every other day" "cutting roses" or "watering plants" (AR 196) and went outside "[d]aily"

20

by driving or riding in a car or walking (AR 197). He had a "difficult time managing money." (Id.) He watched television daily, spoke with his children daily, and would see his doctors "here and there." (AR 198.)

At his August 2015 hearing, Plaintiff testified that he had fallen in February 2014 (AR 38) and had broken his arm and tailbone (AR 46-47). He was at his family's daycare center (AR 41) and fell from a stepladder as he was "picking up something from [a] cabinet" (AR 47). He had previously worked for the daycare center, which is located in a "big room" in his home (AR 42), doing repair work, cooking, washing dishes, and driving children to and from school (AR 43). The daycare center was run by his daughter, and he had stopped working there "two and a half years" earlier. (Id.) On the day he fell, he had not been working at the daycare center but had been "sit[ting] and watching some TV" there and "walking a little bit." (AR 47.) "Walking [was] good for [him]" (AR 47-48), and although he had had "a walker and a cane" after a "small stroke," he "got better" and no longer used them (see AR 46). He would "walk around the neighborhood" and would do so for "about 20 minutes, 30 minutes" during the day until he got "shortness of . . . breath," at which point he would "sit someplace" and then "walk back home." (AR 48.) After sitting in a chair for "maybe 30 minutes or 40 minutes" he would "have to stand up and walk a little bit." (AR 49.) He later testified that he "[couldn't] walk too much," "stand too much," "hold" things, or "lift" things because of pain in his lower back and arm. (AR 52.) But he had a driver's license and still made "[s]hort drives" "around the block" or to

the "grocery [store]." (AR 44.)

3. <u>Analysis</u>

The ALJ provided three clear and convincing reasons to find Plaintiff's subjective symptom testimony "not entirely credible": (1) it was "not supported by the objective medical evidence," (2) it was inconsistent with his "daily activities," and (3) he received "conservative treatment only." (AR 26-27.) The ALJ's other reason, that Plaintiff may have been working at his family's daycare in February 2014 (AR 26), was likely improper but harmless. Thus, remand is unwarranted on this ground.

a. *Objective Medical Evidence*

Inconsistency with objective medical evidence is a "sufficient basis" for rejecting a claimant's subjective symptom testimony. <u>Carmickle v. Comm'r, Soc. Sec. Admin.</u>, 533 F.3d 1155, 1161 (9th Cir. 2008); <u>see</u> <u>Morgan v. Comm'r of Soc. Sec. Admin.</u>, 169 F.3d 595, 600 (9th Cir. 1999) (upholding "conflict between [plaintiff's] testimony of subjective complaints and the objective medical evidence in the record" as "specific and substantial" reason undermining credibility). Although a lack of medical evidence "cannot form the sole basis for discounting pain testimony, it is a factor that the ALJ can consider in his credibility analysis." <u>Burch v. Barnhart</u>, 400 F.3d 676, 681 (9th Cir. 2005); <u>Rollins v. Massanari</u>, 261 F.3d 853, 857 (9th Cir. 2001) (citing § 404.1529(c)(2)). The ALJ here found that Plaintiff's allegations that he couldn't "stand and walk long," had to "alternate sitting and standing," couldn't "lift more than a few pounds," and could "pay attention for [only] a few minutes" were "not supported by the objective medical evidence." (AR 26.)

22

As the ALJ stated, "no clinical findings or imaging studies support[ed] the degree of limitations alleged in this case." (AR 27.) Substantial evidence supports that reasoning.

Plaintiff's complaints of disabling pain with physical exertion were undermined by findings of "normal" gait and "full" or "normal" strength and range of motion in his back and extremities. (See, e.g., AR 250 (June 2013: "normal" or "nearly essentially normal" bulk, tone, and left lower-extremity strength, with only "some weakness in [his] left grip" and "questionable mild weakness versus give-away" in his left upper extremity), 234 (Aug. 2013: "normal [range of motion]" in extremities and "[n]o motor deficit"), 390 (Oct. 2013: "normal [range of motion]" in extremities and no "motor" or "sensory" deficits), 307-09 (Jan. 2014: "normal" gait, "5/5" strength in "all extremities," "grossly normal" range of motion in shoulders and other joints, and negative straight-leg raises, but some "decreased range of motion" in his lumbar spine), 347 (Sept. 2014: "normal gait" and "full," "painless" range of motion in back, with negative straight-leg raises), 358 (Sept. 2014: "normal" bulk and tone, "subtle-mild[]" weakness in left upper extremity, and "very minimal" weakness in left lower extremity), 331 (Nov. 2014: normal extremities with "full range of motion," "painless range of motion" in back, and "no motor deficits").)

Medical imaging further indicated that his condition was unremarkable or at worst mild. (See, e.g., AR 252-54 (June 2013: "[n]ormal" MRI of brain), 255 (June 2013: "[n]ormal" CT of head), 311 (Jan. 2014: x-ray of lumbar spine showing "[e]arly osteophytosis" and some "[b]ony bridgning," but remaining tissues

23

and structures "within normal limits"), 368 (Sept. 2014: MRI of brain showing "[m]inimal age-related changes" but "[o]therwise unremarkable," with "[n]o acute abnormalities demonstrated"), 369-70 (Sept. 2014: MRI of cervical spine showing "normal morphology," "no significant spinal stenosis," "minimal degenerative changes," and some "minimal foraminal narrowing"), 339 (Nov. 2014: MRI of brain showing "[m]ild atrophy," "[m]inimal small vessel ischemic change," "[n]o acute intracranial abnormality," "[n]o evidence for infarct[ion]," and "[n]o appreciable interval change").)  Although a September 2014 CT of his cervical spine indicated some "moderate" disc-space narrowing (AR 371), a neurologist who "personally reviewed" that CT found "no evidence of new stroke, intracranial or carotid stenosis, or any significant cervical [degenerative disc disease]" (AR 367). And although he fractured his wrist in February 2014 (AR 381, 423), which may have impaired his lifting and carrying ability, the condition did not last for more than 12 months and instead healed nicely, with "excellent" alignment (see, e.g., AR 417 (Mar. 2014), 411 (Apr. 2014)).

Plaintiff also frequently exhibited normal heart function. Throughout the relevant period he complained of pain in his chest — at times at an eight out of 10 (AR 388) — but was nonetheless generally found to be normal on examination (see, e.g., AR 257-59 (June 2013: "normal" echocardiogram), 376-77 (Sept. 2014: "normal" echocardiogram), 393 (Oct. 2013: "normal" chest and heart physical examination), 401-02 (Oct. 2013: "normal" echocardiogram), 324 (Nov. 2014: "regular" cardiovascular and respiratory examination)).  At one point, a catheterization was

performed to determine the severity of his condition, but according to the attending cardiologist, it revealed "normal coronaries" and warranted no intervention, such as "angioplasty" or "stents." (AR 387.) By similar measure, although Plaintiff at times alleged severe back pain, he was seen by an orthopedic surgeon who prescribed only pain medication to treat it. (See, e.g., AR 406 (prescribing Ultram).)

Plaintiff's alleged mental impairments were unsupported by the record as well. He claimed an inability to focus and pay attention (AR 190; see also AR 274 (medication disrupted his concentration and focus)) and being "forgetful" (AR 185). But consulting psychological examiner Sherrill, after submitting him to testing, found that he could perform "simple and repetitive tasks" with "appropriate persistence and pace" over a normal work cycle. (AR 277; see also AR 276 (Dr. Sherrill noting that Plaintiff "did not appear hyperactive or easily distracted" and "had no difficulty staying seated and focused during the evaluation").) He could also, in her opinion, understand, remember, and carry out "at least simple to moderately complex" verbal instructions "without difficulty." (AR 277.) Such findings were consistent with those of the state-agency reviewers, who assessed that Plaintiff could perform "simple work-related tasks in a work-setting" and had "no significant work-related limitations in the ability to sustain concentration/persistence/pace or otherwise adapt to the requirements of a normal work-setting." (AR 81.) No doctor found otherwise.

Moreover, Plaintiff's statements that he did not get along

with others were undermined both by his own statements in the record to the contrary (see, e.g., AR 274 (Plaintiff telling Dr. Sherrill that he had "good" relationships with "all types . . . of people"), 191 (stating in function report that he got along "okay" with authority figures)) and by Dr. Sherrill's findings that he could engage in a "friendly conversation" and had "no problems" making eye contact or reading nonverbal behavior, even though she assessed that he would have "mild to moderate" difficulty interacting satisfactorily with others. (AR 276-77.) He "spoke clearly," "underst[ood] test instructions and interview questions without difficulty," and had a "normal" mood and affect. (AR 275-76.) Drs. Asatourian and Singh found that he had "no significant limitations" in social functioning. (AR 80-81, 111-12.) Further still, Plaintiff was noted by other treating physicians throughout the record as being "very pleasant," cooperative, alert, and oriented. (See, e.g., AR 249 (June 2013: "very pleasant"), 307 (Jan. 2014: "alert and oriented"), 357 (Sept. 2014: "very pleasant"), 347 (Sept. 2014: "cooperative"), 358 (Sept. 2014: "alert, fully oriented, with fluent language and intact cognition").)

Thus, the ALJ properly discredited Plaintiff's subjective symptom statements based on substantial contravening evidence in the record. See Carmickle, 533 F.3d at 1161; Morgan, 169 F.3d at 600.

b. *Daily Activities*

An ALJ may discount a claimant's subjective symptom testimony when it is inconsistent with his daily activities. See Molina, 674 F.3d at 1113. "Even where those [daily] activities

suggest some difficulty functioning, they may be grounds for
discrediting the claimant's testimony to the extent that they
contradict claims of a totally debilitating impairment." Id.
The ALJ here found that Plaintiff's subjective complaints of
"severe" and "disabling" symptoms and limitations stood "in
tension" with his reported ability to "drive" and walk on a
treadmill "30 to 45 minutes on most days."[11]  (AR 26.)

Indeed, despite allegations that he "[couldn't] walk too
much" (AR 52) and that he could walk only 10 minutes before
needing to rest (AR 199), he reported regularly walking around
his neighborhood for "20 minutes, 30 minutes" until he had to sit
because of "shortness of the breath" (AR 48; see also AR 47
(testifying that he was "walking a little bit" in Feb. 2014), 197
(Plaintiff's daughter noting he went outside daily, including by
walking)).  He also reported to a treating physician in September
2014, after his fall, that he "walk[ed] on the treadmill 30 to 45
minutes most days" (AR 358), as noted by the ALJ (AR 26).  And
despite his alleged trouble sitting and otherwise exerting
himself (AR 49, 189), he nonetheless "s[a]t and watch[ed] some
TV" in his family's daycare center (AR 47) and could drive, ride
in cars, and take public transportation (AR 44, 188, 197).

He also tended to plants by cutting roses or watering them
(AR 187, 196), could prepare microwaveable meals three times a
day (AR 187), and put dishes away (id.).  And he reported to his

---

[11] The ALJ also noted that Plaintiff could "climb on a
stepladder."  (AR 26.)  But given that on the one instance in the
record when he tried to do that he fell (AR 47), the Court does
not find that example convincing.

consulting psychological examiner that he could perform "all self-care activities independently, including dressing and bathing." (AR 275); see Ronquillo v. Colvin, No. CV 14-6702 JC, 2015 WL 5768348, at *7 (C.D. Cal. Sept. 30, 2015) (ALJ properly discounted plaintiff's credibility "because the alleged severity of his impairment was not consistent with [his] admitted level of activity," which included "walk[ing] around the block," watching television, preparing meals, washing dishes, driving a car, and exercising); Sharp v. Colvin, No. 1:13-cv-02028-BAM, 2015 WL 1274727, at *5 (E.D. Cal. Mar. 19, 2015) (finding that ALJ properly discounted plaintiff's testimony as inconsistent with daily activities when plaintiff cleaned his room, swept carpet, washed dishes, did laundry, cooked occasionally, went grocery shopping with his mother, cared for his dog, and walked around block).

Although he had some trouble interacting with others (AR 190; see also AR 199-200 (Plaintiff's daughter indicating that he "g[ot] in arguments," was "a very negative person," and was fired from his last job because he was "disrespectful of others")), he had "good" relationships with his family and "all types of . . . people" (AR 274), spent time with family every day (AR 189, 198), and got along "okay" with authority figures (AR 191). See Womeldorf v. Berryhill, 685 F. App'x 620, 621 (9th Cir. 2017) (upholding ALJ's discounting of plaintiff's credibility in part because his activities of daily living "were not entirely consistent with his claimed inability to engage in social interactions").

Thus, the ALJ properly discounted Plaintiff's symptom

statements based on their inconsistency with his daily
activities.

c. *Conservative Treatment*

The ALJ discounted Plaintiff's testimony because his
treatment was "conservative." (AR 27.) This was a clear and
convincing reason supported by substantial evidence. See Parra,
481 F.3d at 751. His condition was treated with medication,
which only occasionally consisted of narcotics (see, e.g., AR 242
(June 2013: gabapentin), 192 (Aug. 2013: Plaintiff's function
report listing various medications but none narcotic), 306 (Jan.
2014: gabapentin), 423 (Feb. 2014: acetaminophen-oxycodone), 406
(Oct. 2014: Ultram), 315 (Nov. 2014: gabapentin and Ultram)); by
the time of the hearing he apparently no longer needed narcotic
pain medication (AR 50). Indeed, his medications appeared to
improve his condition. (AR 305-06 (Jan. 2014: Plaintiff
reporting to consulting examiner that his condition improved with
"pain medication[] and rest[]"); see also AR 236 (Aug. 2013:
Plaintiff's complaints of muscle aches and fever "resolved" after
being treated "with fluids")); Warre v. Comm'r, Soc. Sec. Admin.,
439 F.3d 1001, 1006 (9th Cir. 2005) ("Impairments that can be
controlled effectively with medication are not disabling."). He
at one point received a cast for a fractured wrist (AR 381, 423)
and later a wrist-brace recommendation (AR 367), but he never
received or was recommended surgery or other pain-management
interventions, such as epidural or nerve-block injections.

Plaintiff's treatment therefore qualified as conservative.
See Tommasetti v. Astrue, 533 F.3d 1035, 1039-40 (9th Cir. 2008)
("physical therapy and the use of anti-inflammatory medication, a

29

[TENS] unit, and a lumbosacral corset" qualified as conservative treatment); Huizar v. Comm'r of Soc. Sec., 428 F. App'x 678, 680 (9th Cir. 2011) (ALJ permissibly discounted claimant's testimony because her "physical and mental impairments responded favorably to conservative treatment," which included "the use of narcotic/opiate pain medications" (emphasis omitted)); Rodriquez v. Colvin, No. CV 14-03731 AJW, 2016 WL 552648, at *2 (C.D. Cal. Feb. 10, 2016) (treatment "conservative" when Plaintiff with diabetes, back pain, and arthritis was treated with medications, including gabapentin); cf. Lapeirre-Gutt v. Astrue, 382 F. App'x 662, 664 (9th Cir. 2010) (treatment with narcotic pain medication, occipital nerve blocks, trigger-point injections, and cervical-fusion surgery not conservative); Samaniego v. Astrue, No. EDCV 11-865 JC, 2012 WL 254030, at *4 (C.D. Cal. Jan. 27, 2012) (treatment with narcotic pain medication, regular trigger-point injections, and occasional epidural injections not conservative, noting that doctor also "recommended significantly invasive surgery for plaintiff's back"). Thus, the ALJ properly discounted Plaintiff's subjective symptom testimony on this ground.

Even assuming the ALJ erred, see Soltero De Rodriguez v. Colvin, No. CV 14-05765-RAO, 2015 WL 5545038, at *4 (C.D. Cal. Sept. 18, 2015) ("[T]he use of narcotic medication in conjunction with other treatments is generally viewed as non-conservative treatment."), any error was harmless because the ALJ provided two sufficient reasons for rejecting Plaintiff's testimony — inconsistency with the medical record and with his activities of daily living — as already discussed, see Larkins v. Colvin, 674

F. App'x 632, 633 (9th Cir. 2017) ("[B]ecause the ALJ gave
specific, clear and convincing reasons for finding [plaintiff]
not fully credible, any error in the additional reasons the ALJ
provided for finding [her] not fully credible was harmless."
(citing <u>Batson v. Comm'r of Soc. Sec. Admin.</u>, 359 F.3d 1190, 1197
(9th Cir. 2004))).

>                    d.   *Working During the Relevant Period*

The ALJ found that Plaintiff's "[falling] off a stepladder
in the daycare portion of his home [in February 2014] . . .
raise[d] a question whether he perhaps was still working there."
(AR 26.)   The ALJ explained that the "only alleged basis for his
current unemployment" was the "unverifiable" reason that "his
daughter (as his employer)" fired him from the "family business,"
suggesting that Plaintiff very well could have continued to work
at the daycare center during the relevant period.   (AR 27
(quoting AR 191).)   An ALJ may consider work history when
evaluating a claimant's credibility.   <u>See</u> <u>Thomas</u>, 278 F.3d at
958-59.   And the fact that a claimant has worked after his
alleged onset date may constitute a clear and convincing reason
for "finding [the] claimant not fully credible."   <u>See</u> <u>Gartzke v.</u>
<u>Colvin</u>, 129 F. Supp. 3d 1040, 1049-50 (D. Or. 2015).

But as Plaintiff argues, the ALJ's reasoning here was not
fully supported by the evidence.   (<u>See</u> J. Stip. at 27.)   At the
hearing, the ALJ asked Plaintiff what he was "doing in the
daycare center" on the day he fell, and Plaintiff explained that
he would "sit and watch[] some TV" and "go around the house"
because walking was "good for [him]."   (AR 47.)   He did not
explain why he was using a stepladder to reach for something on a

31

shelf if he went to the daycare simply to walk and watch
television. And he had earlier testified that he used to do
repair work for the daycare center, suggesting that that was what
he was actually doing that day. (AR 43.) But the ALJ
specifically asked Plaintiff whether he was "doing some work in
the daycare center when [he fell]," to which Plaintiff responded,
"No." (AR 47.) Moreover, shortly before this discussion,
Plaintiff testified that he had stopped working "completely" two
and a half years earlier, months before the February 2014
incident occurred. (AR 42-43.) His daughter, too, had specified
that Plaintiff was fired from his position at the daycare center,
supporting his testimony that he wasn't working there at the time
of his fall. (See AR 200.)

Nothing else in the record clearly supported the ALJ's
inference that he was in fact working at his family's daycare
center on the day he fell or at any other point during the
relevant period. Without more evidence, the ALJ's reasoning was
speculative. Indeed, the ALJ himself phrased the issue as merely
"rais[ing] a question" that Plaintiff was "perhaps" working at
the time. (AR 26.) Thus, this reason was insufficient.
See Rawa v. Colvin, 672 F. App'x 664, 667-68 (9th Cir. 2016)
(finding that ALJ erred in rejecting claimant's testimony in part
because it was based on ALJ's "own personal speculation"); see
also Lingenfelter, 504 F.3d at 1035 (substantial evidence is more
than "mere scintilla").

As explained above, however, any error was harmless because
the ALJ provided other clear and convincing reasons for
discounting Plaintiff's symptom statements. See Larkins, 674 F.

32

App'x at 633.  Thus, remand is unwarranted.

    B.   <u>The ALJ May Have Erred in Rejecting the Lay-Witness</u>
        <u>Statements, but Any Error Was Harmless</u>

    The ALJ declined to give Plaintiff's daughter's allegations "significant weight," finding that they did not establish that he was "disabled."  (AR 27.)  Plaintiff argues that the ALJ erred because he failed to offer a "germane" reason for his finding. (J. Stip. at 27-28.)  As discussed below, however, any such error was harmless.

    1.   <u>Applicable law</u>

    "In determining whether a claimant is disabled, an ALJ must consider lay witness testimony concerning a claimant's ability to work." <u>Bruce v. Astrue</u>, 557 F.3d 1113, 1115 (9th Cir. 2009) (citing <u>Stout v. Comm'r, Soc. Sec. Admin.</u>, 454 F.3d 1050, 1053 (9th Cir. 2006)); <u>see also</u> § 404.1513(d) (statements from spouses, parents, other relatives, and friends can be used to show severity of impairments and effect on ability to work). Such testimony is competent evidence and "<u>cannot</u> be disregarded without comment." <u>Bruce</u>, 557 F.3d at 1115 (emphasis in original) (citing <u>Nguyen v. Chater</u>, 100 F.3d 1462, 1467 (9th Cir. 1996)); <u>Robbins</u>, 466 F.3d at 885 ("[T]he ALJ is required to account for all lay witness testimony in the discussion of his or her findings.").  When rejecting the statements of a lay witness, an ALJ must give specific reasons germane to that witness. <u>Diedrich v. Berryhill</u>, 874 F.3d 634, 640 (9th Cir. 2017); <u>Bruce</u>, 557 F.3d at 1115; <u>Stout</u>, 454 F.3d at 1053.

    If an ALJ errs by providing reasons that are not germane, the error may be harmless. <u>See</u> <u>Valentine v. Comm'r Soc. Sec.</u>

Admin., 574 F.3d 685, 694 (9th Cir. 2009). An error is harmless
if it is "'inconsequential to the ultimate nondisability
determination' in the context of the record as a whole," Molina,
674 F.3d at 1122 (citations omitted); see also Tommasetti, 533
F.3d at 1038, such as when "the same evidence that the ALJ
referred to in discrediting [the claimant's] claims also
discredits [the lay witness's] claims," Molina, 674 F.3d at 1122
(alterations in original) (citing Buckner v. Astrue, 646 F.3d
549, 560 (8th Cir. 2011)).

    2.    Analysis

    The ALJ discounted Plaintiff's daughter's statements because
(1) her "relationship" with him meant that she was not "a
disinterested third party witness," (2) she was "not medically
trained," and (3) her statements were "not consistent with the
preponderance of the opinions, observations and findings by
medical doctors in this case." (AR 27.) These reasons have been
found in some circumstances not to be germane.

    First, although an ALJ may discount a lay witness's
testimony because of her "close relationship" with a claimant and
the possibility that she may be "influenced by her desire to
help," Greger v. Barnhart, 464 F.3d 968, 972 (9th Cir. 2006),
"friends and family members in a position to observe a claimant's
symptoms and daily activities" are nonetheless "competent to
testify as to his or her condition," "regardless of whether they
are interested parties," Diedrich, 874 F.3d at 640 (citing
Valentine, 574 F.3d at 694)). Second, a lay witness's lack of
medical training is not a germane reason to discount her
testimony. See May v. Berryhill, No. CV 17-4085-PLA, 2018 WL

34

2094347, at *8 (C.D. Cal. May 4, 2018) (holding that "[l]ay witnesses are not required to have medical training" — as "[t]hat is what makes them 'lay' witnesses" — and that "[d]iscounting the 'accuracy' of a lay witness' statement because the witness is not medically trained would allow an ALJ to routinely reject most such statements for this reason alone"). And although inconsistency with medical evidence can be a germane reason for rejecting the testimony of "friends and family," see Bayliss v. Barnhart, 427 F.3d 1211, 1218 (9th Cir. 2005), lay-witness testimony may "offer a different perspective than medical records alone," which "is precisely why such evidence is valuable," see Diedrich, 874 F.3d at 640 (citing Smolen, 80 F.3d at 1289)). Accordingly, the ALJ's express reasons for discounting Plaintiff's daughter's statements may have been impermissible.

As discussed above, however, the ALJ provided clear and convincing reasons for discounting Plaintiff's own testimony, providing a sufficient basis for rejecting his daughter's statements as well. Valentine, 574 F.3d at 694 (finding that although ALJ improperly discounted claimant's wife's testimony in part because she was "an interested party," any error was harmless because ALJ gave clear and convincing reasons for rejecting claimant's "similar" subjective complaints); Molina, 674 F.3d at 1122 (holding that ALJ's error in rejecting lay witnesses' testimony was "harmless" because "ALJ had validly rejected all the limitations described by the lay witnesses in discussing [claimant's] testimony"). Indeed, the daughter completed both Plaintiff's and her own function reports. (See AR 185-200.) Her statements, like Plaintiff's testimony, alleged

35

that he had difficulties with focus and memory (AR 194), social interaction (AR 199), walking (id.), and standing (AR 196). She even alleged the same daily activities. (See, e.g., AR 197 (he went outside "[d]aily" by walking, driving, or riding in car), 198 (he watched television, spent time with his family, and saw doctors), 196 (he cut roses and watered plants).) Thus, because the ALJ provided sufficient reasons to discount Plaintiff's similar testimony, any error by the ALJ as to his daughter's statements was harmless. See Molina, 674 F.3d at 1122.

C.  Remand Is Not Warranted Based on the ALJ's Evaluation of the Medical-Opinion Evidence or His Severity Determination, RFC Assessment, or Past-Relevant-Work Finding

Plaintiff argues that the ALJ improperly evaluated the opinions of consulting examiner Sherrill and state-agency reviewers Asatourian[12] and Singh regarding his mental-health impairments (J. Stip. at 4-5) as well as the opinions of treating physician Nersissian and consulting examiner Dhiman regarding his physical-health impairments (id. at 12-17). As discussed below, although the ALJ erred as to Drs. Sherrill's, Asatourian's, and Singh's opinions, the error was harmless. The ALJ, moreover, didn't err in his evaluation of Drs. Nersissian's and Dhiman's opinions. Accordingly, because the ALJ's evaluation of the

_____

[12] Plaintiff incorrectly identifies state-agency reviewer S. Latchamsetty as providing one of the mental-health opinions at issue, but Dr. Latchamsetty assessed only Plaintiff's physical health. (See, e.g., AR 89-90.) Drs. Asatourian and Singh were the state-agency reviewers who assessed Plaintiff's mental health. (AR 72-83, 112.)

medical-opinion evidence does not constitute reversible error,
Plaintiff's contentions regarding the ALJ's severity, RFC, and
past-relevant-work determinations are moot. Remand is therefore
unwarranted.

### 1. Applicable law

The step-two inquiry is "a de minimis screening device to
dispose of groundless claims" when a claimant's impairments are
not severe. Smolen, 80 F.3d at 1290. "An impairment or
combination of impairments may be found 'not severe only if the
evidence establishes a slight abnormality that has no more than a
minimal effect on an individual's ability to work.'" Webb v.
Barnhart, 433 F.3d 683, 686 (9th Cir. 2005) (quoting Smolen, 80
F.3d at 1290 (emphasis in original)). A court must determine
whether substantial evidence in the record supported the ALJ's
finding that a particular impairment was not severe. Id. at 687.

A claimant's RFC is "the most [he] can still do" despite
impairments and related symptoms that "may cause physical and
mental limitations that affect what [he] can do in a work
setting." § 404.1545(a)(1). A district court must uphold an
ALJ's RFC assessment when the ALJ has applied the proper legal
standard and substantial evidence in the record as a whole
supports the decision. Bayliss, 427 F.3d at 1217. The ALJ must
consider all the medical opinions "together with the rest of the
relevant evidence." § 404.1527(b);[13] see also § 404.1545(a)(1)

---

[13] Social Security regulations regarding the evaluation of
opinion evidence were amended effective March 27, 2017. When, as
here, the ALJ's decision is the final decision of the
Commissioner, the reviewing court generally applies the law in
effect at the time of the ALJ's decision. See Lowry v. Astrue,

("We will assess your residual functional capacity based on all the relevant evidence in your case record.").

Three types of physicians may offer opinions in Social Security cases: those who directly treated the plaintiff, those who examined but did not treat the plaintiff, and those who did neither. Lester, 81 F.3d at 830. A treating physician's opinion is generally entitled to more weight than an examining physician's, and an examining physician's opinion is generally entitled to more weight than a nonexamining physician's. Id.; see § 404.1527(c)(1). This is so because treating physicians are employed to cure and have a greater opportunity to know and observe the claimant. Smolen, 80 F.3d at 1285. But "the findings of a nontreating, nonexamining physician can amount to substantial evidence, so long as other evidence in the record supports those findings." Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1996) (per curiam) (as amended).

The ALJ may disregard a physician's opinion regardless of whether it is contradicted. Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989); see Carmickle, 533 F.3d at 1164. When a doctor's opinion is not contradicted by other medical-opinion evidence, however, it may be rejected only for a "clear and

---

474 F. App'x 801, 804 n.2 (2d Cir. 2012) (applying version of regulation in effect at time of ALJ's decision despite subsequent amendment); Garrett ex rel. Moore v. Barnhart, 366 F.3d 643, 647 (8th Cir. 2004) ("We apply the rules that were in effect at the time the Commissioner's decision became final."); Spencer v. Colvin, No. 3:15-CV-05925-DWC, 2016 WL 7046848, at *9 n.4 (W.D. Wash. Dec. 1, 2016) ("42 U.S.C. § 405 does not contain any express authorization from Congress allowing the Commissioner to engage in retroactive rulemaking."). Accordingly, citations to 20 C.F.R. § 404.1527 are to the version in effect from August 24, 2012, to March 26, 2017.

convincing" reason.  Magallanes, 881 F.2d at 751; Carmickle, 533

F.3d at 1164 (citing Lester, 81 F.3d at 830-31).  When it is

contradicted, the ALJ must provide only a "specific and

legitimate" reason for discounting it.  Carmickle, 533 F.3d at

1164 (citing Lester, 81 F.3d at 830-31).  The weight given a

treating or examining physician's opinion, moreover, depends on

whether it is consistent with the record and accompanied by

adequate explanation, among other things.  § 404.1527(c)(3)-(6).

Those factors also determine the weight afforded the opinions of

nonexamining physicians.  § 404.1527(e).  The ALJ considers

findings by state-agency medical consultants and experts as

opinion evidence.  Id.

In determining an RFC, the ALJ should consider those

limitations for which there is support in the record and need not

take into account properly rejected evidence or subjective

complaints.  See Bayliss, 427 F.3d at 1217 (upholding ALJ's RFC

determination because "the ALJ took into account those

limitations for which there was record support that did not

depend on [claimant]'s subjective complaints"); Batson, 359 F.3d

at 1197 (ALJ not required to incorporate into RFC those findings

from physician opinions that were "permissibly discounted").

Furthermore, "[t]he ALJ need not accept the opinion of any

physician . . . if that opinion is brief, conclusory, and

inadequately supported by clinical findings."  Thomas, 278 F.3d

at 957; accord Batson, 359 F.3d at 1195.  An ALJ need not recite

"magic words" to reject a physician's opinion or a portion of it;

the court may draw "specific and legitimate inferences" from the

ALJ's opinion.  Magallanes, 881 F.2d at 755.  "[I]n interpreting

the evidence and developing the record, the ALJ does not need to 'discuss every piece of evidence.'" <u>Howard ex rel. Wolff v. Barnhart</u>, 341 F.3d 1006, 1012 (9th Cir. 2003) (quoting <u>Black v. Apfel</u>, 143 F.3d 383, 386 (8th Cir. 1998)).

The Court must consider the ALJ's decision in the context of "the entire record as a whole," and if the "'evidence is susceptible to more than one rational interpretation,' the ALJ's decision should be upheld." <u>Ryan v. Comm'r of Soc. Sec.</u>, 528 F.3d 1194, 1198 (9th Cir. 2008) (citation omitted).

    2.  <u>Analysis</u>

    a.  *Drs. Sherrill, Asatourian, and Singh*

The ALJ found no severe mental impairment and included no mental limitations in Plaintiff's RFC. (<u>See</u> AR 21-23.) But Dr. Sherrill, to whose opinion the ALJ gave "great weight" (AR 27), found that Plaintiff had "mild to moderate" difficulty interacting with others (AR 277), and Drs. Asatourian and Singh opined that Plaintiff was limited to "simple" tasks and had "moderate" mental difficulties (<u>see</u> AR 79-81, 111-12). The ALJ gave no reason for rejecting any of those findings, and that was error. <u>See Embrey v. Bowen</u>, 849 F.2d 418, 421-22 (9th Cir. 1988) ("The ALJ must do more than offer his conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct.").

Indeed, the ALJ gave no reason for discounting any of the opinions of the state-agency mental-health reviewers, who found that Plaintiff had the severe impairment of "Affective Disorders," a simple-task mental RFC, and some "moderate" difficulties in "understanding and memory" and "concentration and

persistence." (See AR 27 (ALJ giving "[s]omewhat less weight" to state-agency assessment but only discussing physical-health findings); see also AR 76, 79-81, 107, 111-12.) And although he gave reasons for crediting Dr. Sherrill's opinion (see AR 27), those reasons did not address his implicit rejection of her social-limitation assessment.

The ALJ summarized Dr. Sherrill's opinion as assessing "at most mild" limitations, but that was not true: Dr. Sherrill found that Plaintiff had "mild to moderate" difficulty interacting satisfactorily with others, including the general public (AR 277). Plaintiff's lack of mental-health treatment, moreover, also cited by the ALJ (AR 27), was a questionable basis for evaluating Dr. Sherrill's opinion. See Nguyen, 100 F.3d at 1464-65 (claimant's failure to seek any psychiatric treatment for over three years not legitimate basis for discounting medical opinion). But see Judge v. Astrue, No. CV 09-4743-PJW, 2010 WL 3245813, at *4 (C.D. Cal. Aug. 16, 2010) ("[The claimant's] failure to get treatment after 1997 seems more a function of the fact that she did not need it, as opposed to her inability to comprehend that she needed it."). And Dr. Sherrill's "detailed examination findings," which the ALJ referenced and credited (AR 27), still led her to assess a "mild to moderate" social-interaction limitation (AR 277). The ALJ apparently rejected that limitation without stating why his interpretation of those same examination findings was more appropriate than hers. See Embrey, 849 F.2d at 421-22.

Because the ALJ erred in implicitly rejecting portions of Drs. Sherrill's, Asatourian's, and Singh's opinions, he also

41

erred in his mental-impairment analysis at step two, see Edlund
v. Massanari, 253 F.3d 1152, 1158-60 (9th Cir. 2001) (as
amended), and in his mental-RFC determination at step four, see
Martin v. Comm'r of Soc. Sec. Admin., 472 F. App'x 580, 580 (9th
Cir. 2012).

Plaintiff argues that those errors were harmful because the
ALJ concluded at step two that his mental impairments were
nonsevere and thus failed to include in his RFC any mental
limitations — specifically one for simple tasks.  (J. Stip. at
5.)  Had the ALJ done so, Plaintiff contends, he would have found
him incapable of performing his past relevant work.  (Id. at 5,
11-12.)  Plaintiff is correct that a severe mental impairment
resulting in a simple-task limitation would conflict with his
past work as an auto mechanic and child monitor, which have
reasoning levels of four and three, respectively.  See DOT
620.261-010, 1991 WL 685242; DOT 301.677-010, 1991 WL 672652; see
also Zavalin v. Colvin, 778 F.3d 842, 847 (9th Cir. 2015)
(holding that "there is an apparent conflict between the residual
functional capacity to perform simple, repetitive tasks, and the
demands of Level 3 Reasoning"); accord Simpson v. Berryhill, 717
F. App'x 670, 673 (9th Cir. 2017).

But any error was harmless because the ALJ questioned the VE
about a hypothetical person with Plaintiff's RFC and who was
further limited to "simple, routine tasks" and making "simple
work-related decisions."  (AR 61.)  The VE testified that such a
person could not perform Plaintiff's past relevant work but could
perform "other jobs," including hand packager, DOT 920.587-018,
1991 WL 687916 (reasoning level 2), and kitchen helper, DOT

42

318.687-010, 1991 WL 672755 (reasoning level 2). (AR 61-63.)
Thus, any error by the ALJ in not properly accounting for Drs.
Asatourian's and Singh's simple-task and other moderate
limitations was harmless. See Stubbs-Danielson v. Astrue, 539
F.3d 1169, 1173-74 (9th Cir. 2008) (ALJ adequately accounts for
moderate mental limitations by limiting claimant to "simple"
tasks); Hernandez v. Berryhill, 707 F. App'x 456, 458 (9th Cir.
2017) (finding "no apparent conflict" between limitation to
"simple, repetitive tasks" and job with "Level 2" reasoning);
Bickell v. Astrue, 343 F. App'x 275, 278 (9th Cir. 2009) (ALJ's
error in finding "depression and personality disorder" not severe
was "harmless" because he "subsequently considered the evidence
of the impact of that disease at later steps").

Further, the ALJ's failure to address Dr. Sherrill's mild-
to-moderate social-interaction limitation was harmless because
the "other jobs" identified by the VE — hand packager, DOT
920.587-018, 1991 WL 687916, and kitchen helper, DOT 318.687-010,
1991 WL 672755 — did not involve "significant" social
interaction. Indeed, a "hand packager" is defined under the DOT
as someone who "[p]ackages materials and products manually" and
carries out tasks that do not generally include social
interaction, such as padding crates and assembling cartons.
See 1991 WL 687916. Similarly, a "kitchen helper," as defined
under the DOT, "maintain[s] kitchen work areas and restaurant
equipment and utensils in clean and orderly condition" and does
other tasks that may not require social interaction, such as
sweeping and mopping floors and removing trash. See 1991 WL
672755. Although both positions involve taking instructions,

43

neither requires more than the lowest degree of verbal aptitude, and "[t]alking" is an "[a]ctivity or condition [that] does not exist." See 1991 WL 687916; 1991 WL 672755.

Thus, as generally performed, those positions were consistent with a mild-to-moderate limitation in social interaction. See Beckwith v. Colvin, No. 3:13-cv-01726-PK, 2014 WL 5791569, at *8 (D. Or. Nov. 6, 2014) (finding that ALJ's error of not including "any limitations on social interactions in the RFC" was harmless because VE testified that plaintiff could perform "garment folder" job, which "d[id] not involve significant interaction with people and entail[ed] a low degree of verbal aptitude, consistent with 'moderate' difficulties in social functioning"); Floyd v. Astrue, No. C08-5700 FDB, 2009 WL 3294838, at *6 (W.D. Wash. Oct. 13, 2009) (finding that inclusion of "moderate limitation in interacting appropriately with the general public" would have "resulted in the same ultimate disability determination" because plaintiff would still have been able to perform work as "cleaner," for which "dealing with people [was] not a significant requirement"). Remand is therefore unwarranted on this ground.

b.  *Drs. Nersissian and Dhiman*

The ALJ gave "partial" weight to Dr. Nersissian's opinion and "substantial" weight to Dr. Dhiman's. (AR 25, 27.) The opinions contradicted each other, and thus the ALJ was required to provide a specific and legitimate reason for discounting all or part of them. See Carmickle, 533 F.3d at 1164. He did.

The ALJ rejected parts of Dr. Nersissian's opinion because it was "conclusory" and unsupported by "medical findings" (AR

26); he credited Dr. Dhiman's opinion because it was supported by "substantial medical evidence" (AR 27). This was sufficiently specific and legitimate. See Thomas, 278 F.3d at 957 (ALJ need not accept doctor's opinion that "is brief, conclusory, and inadequately supported by clinical findings"); Tommasetti, 533 F.3d at 1041 (inconsistency with medical record "specific and legitimate" reason for rejecting treating-source opinion).

Dr. Nersissian opined that Plaintiff could "stand and/or walk" for less than two hours in an eight-hour workday. (AR 454.) But consistent with Dr. Dhiman's opinion (AR 309 (limiting Plaintiff to "stand[ing] and walk[ing]" six hours in eight-hour workday)), his findings on examination demonstrated "normal" gait and station, "negative" straight-leg raises, "5/5" strength in "all extremities," and "grossly normal" range of motion in his hips, knees, and ankles despite Plaintiff's difficulty tandem and heel-toe walking (AR 307-09). Dr. Nersissian's treatment notes do not indicate that he ever conducted similar examinations of Plaintiff's ability to stand or walk or any related functions. See Larkins, 674 F. App'x at 633 (ALJ properly rejected physician's opinion that was "inconsistent . . . with his own findings"); Hernandez, 707 F. App'x at 457-58 (inconsistency with "own treatment notes" is specific and legitimate reason for discounting physician's opinion).

Dr. Nersissian also opined that Plaintiff could lift or carry only up to 10 pounds occasionally and frequently (AR 454), while Dr. Dhiman opined that he could lift or carry 50 pounds occasionally and 25 pounds frequently (AR 309). Consistent with Dr. Dhiman's opinion, Plaintiff's medical records frequently

45

showed that he had "essentially normal" strength and range of
motion in his back and extremities, as discussed above, even
after his February 2014 fall. (See, e.g., AR 250 (June 2013),
234 (Aug. 2013), 390 (Oct. 2013), 307-09 (Jan. 2014), 347 (Sept.
2014), 358 (Sept. 2014), 331 (Nov. 2014).) Moreover, Dr.
Nersissian did not point to any medical findings to support his
opinion. See Thomas, 278 F.3d at 957; Van Orsdol v. Colvin, 671
F. App'x 410, 410 (9th Cir. 2016) (physician's opinion properly
discounted when it was "unexplained and unsupported by
evidence").

Dr. Nersissian opined that because of carpal-tunnel
syndrome, Plaintiff could constantly reach, occasionally handle,
and never finger or feel with his fingertips (AR 455), and Dr.
Dhiman opined that he could frequently feel, finger, grasp, and
reach overhead (AR 309-10). The ALJ rejected such limitations,
explaining as to the state-agency reviewers' similar opinions
that there was "no sound basis for [them]." (AR 27.) Indeed,
the evidence demonstrated only mild weakness at times in
Plaintiff's hands and upper extremities. (See, e.g., AR 250
(June 2013: "some weakness in the left grip"), 390 (Oct. 2013: no
motor or sensory "deficit[s]"), 309 (Jan. 2014: "normal"
neurologic function), 358 (Sept. 2014: "some" "diffuse" weakness
in left hand), 331 (Nov. 2014: "no motor deficits" or "sensory
deficits," extremities had "full range of motion").) Thus, the
ALJ's finding was reasonable. Robbins, 466 F.3d at 882 ("If the
evidence can support either affirming or reversing the ALJ's
conclusion, we may not substitute our judgment for that of the

ALJ.").[14]

Plaintiff argues that "there is no statutory requirement that an impairment be proved by 'objective' testing," citing Shore v. Callahan, 977 F. Supp. 1075, 1079 (D. Or. 1997). (J. Stip. at 15.) In Shore, an ALJ rejected a treating physician's opinion based on lack of "objective medical tests" corroborating plaintiff's chronic fatigue syndrome; that was improper because "there [was] no 'dipstick' laboratory test for chronic fatigue syndrome" and the condition could not be "conclusively diagnosed in a laboratory setting." 977 F. Supp. at 1079.

Here, unlike in Shore, Plaintiff did not allege or experience an amorphous condition like chronic fatigue syndrome; his purported conditions and limitations could be verified objectively. Indeed, the ALJ found that he had the medically determinable severe impairments of "orthopedic issues in the back and left leg, arm and wrist," consistent with Dr. Nersissian's findings. (AR 21.) But as discussed, the ALJ discounted the severity of his symptoms and Dr. Nersissian's related functional

---

[14] The ALJ's rejection of those limitations, even if incorrect, was harmless because he had posed a third hypothetical to the VE that included "additional physical limitations": "occasional" fingering or feeling with the left hand and "frequent" posturals. (AR 66.) The VE testified that such a person could not perform any of Plaintiff's past work but could perform "other jobs." (AR 66-67.) For example, he could work as an "office helper," DOT 239.567-010, 1991 WL 672232, which was an unskilled, light-work position that required only level-two reasoning and no significant social interaction. (See AR 67); see Summers v. Astrue, EDCV 10-1060 RNB, 2011 WL 1211860, at *2-3 (C.D. Cal. Mar. 30, 2011) (finding ALJ's error in not fully incorporating medical opinion into RFC harmless because ALJ posed to VE hypothetical including missing limitations and VE testified to availability of other jobs).

assessments because the physical tests, examinations, and medical imaging in the record generally demonstrated that Plaintiff had full strength, range of motion, and functionality. See Batson, 359 F.3d at 1195 ("[A]n ALJ may discredit treating physicians' opinions that are conclusory, brief, and unsupported by . . . objective medical findings[.]"). Plaintiff's reliance on Shore is thus unavailing.[15]

Because the ALJ properly rejected portions of Drs. Nersissian's and Dhiman's opinions, he was not required to incorporate those findings into the RFC; his RFC determination contained those limitations substantiated in the record. See Bayliss, 427 F.3d at 1217; Batson, 359 F.3d at 1197. The ALJ therefore didn't err in this regard. Thus, remand is unwarranted on this ground.

## VI. CONCLUSION

Consistent with the foregoing and under sentence four of 42 U.S.C. § 405(g),[16] IT IS ORDERED that judgment be entered

---

[15] Plaintiff further argues that the ALJ improperly rejected Dr. Nersissian's opinion because it "appear[ed] [to be] based on uncritical acceptance of [Plaintiff's] subjective statements." (J. Stip. at 14-15 (citing AR 26).) Because the ALJ gave clear and convincing reasons for discounting Plaintiff's testimony, that was not necessarily an improper finding. See Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001). In any event, even if the ALJ erred, any error was harmless because he provided a specific and legitimate reason for rejecting Dr. Nersissian's opinion, lack of support from "medical findings," as discussed above. See Howell v. Comm'r Soc. Sec. Admin., 349 F. App'x 181, 184 (9th Cir. 2009); DeBerry v. Comm'r of Soc. Sec. Admin., 352 F. App'x 173, 176 (9th Cir. 2009).

[16] That sentence provides: "The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the

48

1  AFFIRMING the Commissioner's decision, DENYING Plaintiff's

2  request for remand, and in Defendant's favor.

3

4  DATED: _June 13, 2018_ _____ _____

5  JEAN ROSENBLUTH
   U.S. Magistrate Judge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27  _____

28  cause for a rehearing."